In re George Charles BRADY, III, Joan Kilkenny Brady, Debtors.

**William H. Michener, Jr., individually and as Executor of The Estate of Margaret E. Quinn, deceased, by the Pennsylvania Lawyers Fund for Client Security, Plaintiffs,**

v.

**George Charles Brady, III, Joan Kilkenny Brady, Defendants.**

Bankruptcy No. 98–33579DAS. Adversary No. 99–0050.

United States Bankruptcy Court, E.D. Pennsylvania, Philadelphia Division.

June 14, 1999.

Robert Szwajkos, Lavin, Coleman, Finarelli & Gray, Philadelphia, PA, for debtors.

Charles J. King, Norristown, PA, for plaintiffs.

Marvin Krasny, Philadelphia, PA, trustee.

Frederic Baker, Ass't. U.S. Trustee, Philadelphia, PA, United States Trustee.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Presently before us in this adversary proceeding ("the Proceeding") asserting the nondischargeability of debts arising out of the voluntary joint Chapter 7 bankruptcy case of GEORGE CHARLES BRADY, III ("the Husband") and JOAN KILKENNY BRADY ("the Wife," with the Husband, "the Debtors") is not only the merits of the claims but also a motion of the original party plaintiff to amend the Complaint ("the Motion"), mostly in order to correctly identify the parties plaintiff. The Motion seeks to meet a challenge to the standing of WILLIAM H. MICHENER, JR. ("Michener"), a former client of the Husband, to prosecute the Proceeding in light of Michener's according subrogation rights to the Pennsylvania Lawyers Fund for Client Security ("the Fund") in consideration for payment of $15,000 admittedly misappropriated by the Husband, then an attorney, from Michener's estate account.

We grant the Motion because the amendment merely redefines the parties prosecuting the Proceeding and recites facts and claims identical to those stated in

the original timely Complaint. We hold that the claims for all sums at issue are nondischargeable pursuant to § 523(a)(4), that the Fund is entitled to a claim for the $15,000 that it advanced, and that the Plaintiff is entitled to assert claims for any other misappropriated sums. Further, we hold that, under applicable Pennsylvania law, the Wife is presumed liable for the $15,000 portion of entireties realty acquired with funds obtained through the Husband's misdeeds, and that she failed to rebut that presumption. Finally, we reject all of the Debtors' other arguments, including invocation of the Eleventh Amendment and contentions that misappropriations other than the $15,000 were not proven, holding that all claims of misappropriations are nondischargeable as to the Husband, but reminding the parties that it is not our duty to liquidate all of these claims.

## B. PROCEDURAL AND FACTUAL HISTORY

The Debtors' main bankruptcy case was filed on October 21, 1998. The Husband formerly practiced as an attorney in the Commonwealth of Pennsylvania. In the course of his practice, he undertook the representation of Michener in his capacity as executor of the decedent estate of Margaret Quinn, Michener's aunt ("the Estate"). When the Husband found himself in need of $35,000 to make a December 14, 1989, settlement on the purchase of the Debtors' present residence at 1417 Uxbridge Way, North Wales, PA 19454 ("the Home"), by the entireties with the Wife, he admittedly improperly drew $15,000 of this sum from the Estate's account without Michener's knowledge or permission. The Estate was admittedly one of two estates invaded for this purpose, although unlike the other estate, this Estate's funds were never restored.

In addition, Michener claimed a right to recover $6,000 which the Husband earlier withdrew from the Estate account in a self-addressed check of March 10, 1989,

which was pre-signed by Michener and the face of which included the notation "Repayment of loan." Finally, Michener claimed a right to recover $465.32 transferred by the Husband to an account of his own in closing the Estate's account on March 24, 1993.

The Debtors' defense of dischargeability of the $15,000 arose from the fact that, upon discovering that funds were missing from the Estate's account, Michener sought reimbursement for his losses from the Fund. The Fund was established pursuant to Subchapter E, Pennsylvania Rules of Disciplinary Enforcement 501 through 531 as a resource for victims of dishonest attorneys in Pennsylvania, and endeavors to respond to meritorious claims by reimbursing clients for losses sustained by reason of attorney misconduct. See generally 1 STANDARD PA.PRAC.2d 627–33 (1995).

In connection with the claims in the Proceeding against the Debtors on account of the $15,000 in funds misappropriated for the Home purchase, the defense focuses on the terms of a written Subrogation Agreement and Assignment ("the Agreement") executed by Michener in favor of the Fund a prerequisite for recovery of that sum. The Agreement, as quoted at page 661 infra, assigned "all" of the Estate's claims against the Husband, to the Fund. It further stated that the Fund became a subrogee to any outstanding claims that the Estate may have retained against the Husband. The Debtors argued that only the Fund, as opposed to Michener, retained any claims for the $15,000 or any other sums arising out of misappropriations from the Estate against the Husband, and hence Michener lacked standing to assert either the claim for $15,000 or any other claims against the Debtors. The Wife testified that she had no knowledge of the details of the Husband's law practice nor any reason to believe that part of the funds used to purchase the Home were misappropriated until the charges against the Husband surfaced in 1993.

The Husband testified that his subsequent criminal conviction and a disbarment, the latter of which was to continue until he paid certain unspecified restitution which apparently included the $15,000 misappropriation, had primarily resulted from subsequent and larger misappropriations. While he had no explanation for the $465.32 misappropriation, he testified, though admittedly with no written documentation or clear recollection of details to support him, that the $6,000 check represented a repayment of his personal advance for Michener to make a purchase for his baseball trading card business. The Debtors also pleaded, in a Counterclaim, that the $6,465.32 total was payable to the Husband for various services for the Estate, which he recited in some detail.

On his part, Michener denied that he ever made any personal loan from the Husband or made any agreement to pay him any compensation. Also admitted into evidence by him were four checks other than the $6,000 check written by the Husband, dated between 1986 and 1988, whereby the Husband had received a total of $6,600, which included notations indicating that they were included as payments for legal fees. He also produced eight checks totaling $37,000, dated between March and May 1989, which were designated as "partial distributions" from the Estate. Michener claimed that these funds, as opposed to any loans from the Husband, were used to finance his baseball trading card business.

On March 12, 1999, the Debtors filed a Motion to Dismiss the Proceeding, which we denied on April 13, 1999 in a decision reported as *In re Brady*, 1999 WL 219766 (Bankr.E.D.Pa.) (*"Brady I"*). Therein, we considered their arguments that (1) Michener rather than the Fund must be considered as the sole complainant; (2) Michener had already received compensation for the $15,000 misappropriation from the Fund, foreclosing that claim; and (3) the merger aspect of *res judicata* or collateral estoppel barred any additional claims of

misappropriation. *Id.* at *1–*3. We held that the status of the Fund as the claimant of the $15,000 could be cured by amendment of the Complaint. *Id.,* at *2. The merger argument was rejected because the nature of the Fund's proceedings and its alleged prior "decision" were unclear. *Id.* at *2–*3. Also, the Debtors argued that no claim had been stated against the Wife, but we rejected that position as not made out on that record. *Id.* at *3.

Following the trial, we permitted the parties to submit simultaneous opening briefs on the merits of the Proceeding and the Motion by May 14, 1999, and reply briefs on or before May 28, 1999. The Debtors opposed the Motion and the assertions of nondischargeability on the following bases: (1) the Motion sought to improperly join a new complainant after the bar date; (2) Michener lacked standing to pursue any claims because he had signed the Agreement subrogating the Fund to his claims; (3) the Fund was barred from proceeding with any claims by the Eleventh Amendment to the federal Constitution, citing *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); and (4) the Wife had no liability to either Michener or the Fund because it was not proven that she either had knowledge or had participated in her Husband's fraudulent actions. In their reply brief, the Debtors re-emphasized the foregoing points and further argued that no misappropriations other than the $15,000 were proven and that no constructive trust of the Home was needed because the terms of the Husband's readmission to practice already provided him with ample incentive to repay the $15,000.

## C. DISCUSSION

1. *Since the Proposed Amendments to the Complaint Change No Underlying Factual Averments or Legal Claims and Are Limited to Joinder of the Fund as a Co-Plaintiff, the Motion Is Granted.*

Albeit after the bar date for the assertion of nondischargeability claims, the

Fund has requested leave to join the Proceeding as a real party plaintiff in interest to the original timely-filed Complaint on the strength of its status as a subrogee pursuant to the Agreement. In reciting the circumstances under which an amendment of a discharge/dischargeability complaint after the bar date will be permitted, we stated at length as follows in *In re Segal*, 195 B.R. 325, 329–30 (Bankr. E.D.Pa.1996), quoting *In re Cohen*, 139 B.R. 327, 332 (Bankr.E.D.Pa.1992):

> an amendment to a complaint challenging a debtor's discharge must generally be filed " 'not later than 60 days following the first date set for the meeting of creditors held pursuant to § 341(a),' " quoting Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 4004(a). This provision, and a mirror provision regarding dischargeability complaints appearing in F.R.B.P. 4007(c), reflect a conscious policy decision made by Congress, in enacting the Bankruptcy Code, to compel diligent prosecution of objections and assure a prompt disposition of the debtor's right to a discharge, and "to further the 'fresh start' goals of bankruptcy relief . . . so a petitioning debtor will enjoy finality and certainty . . . as quickly as possible." *Cohen*, 139 B.R. at 332, citing 4 COLLIER ON BANKRUPTCY, ¶ 727.14[4], at 727–98 to 727–101 (15th ed.1991). We noted [in *Cohen*] that, although some courts have held that additional or new grounds for objections to discharge or dischargeability may not be added to a complaint asserting different grounds once the 60–day deadline imposed by F.R.B.P. 4004(a) and F.R.B.P. 4007(a) have passed, *see id.* at 332, others have permitted an amended complaint to be filed after the bar date as long as the amendment related directly back to the original complaint. *Id.*

> This latter, more liberal approach to amendment practice is suggested by F.R.B.P. 7015, incorporating Rule 15 of the Federal Rules of Civil Procedure ("F.R.Civ.P."). F.R.Civ.P. 15(a) and 15(c), focus on whether notice of the newly-asserted claim can be said to have been given to the defendant from the factual averments contained in the original complaint. *See Cohen, supra*, at 332–33. The test of whether an amendment relates back to the original complaint essentially reduces to the following: an amendment relates back if the original complaint gives fair notice of the facts underlying the newly-asserted claims. *Id.* at 333.

*See also, e.g., In re Mumin*, 1998 WL 119545 (Bankr.E.D.Pa. March 13, 1998).

A careful comparison of the original Complaint and the proposed amended Complaint reveals but two substantive alterations proposed in the amendment. The first is the addition of the Fund as a plaintiff in the caption. The second is the attachment of the Agreement linking the Fund to Michener as his subrogee as an exhibit to the Complaint. We note that, except for certain minor grammatical alterations in the phrasing of some of its averments, all of the six paragraphs which comprise the body of the original timely-filed Complaint were repeated identically in the proposed amended Complaint. Thus, there is no basis to argue that the amendment has in any way sought to introduce either facts or claims that were not already asserted in the original timely-filed Complaint. *Compare Segal, supra*, 195 B.R. at 330–31. As a result, fair notice of the fact situation and the applicable law on which the proposed amended Complaint is based was given in the original Complaint, and thus it is appropriate to permit it to "relate back" to the date of the filing of the original Complaint.

■ Our decision that the Motion should be granted does not resolve entirely the substance of the standing issue raised by the Debtors. It merely allows us to, *inter alia*, revise the caption in the rather ambiguous manner which the Motion requested and to allow the Fund to join the Proceeding in some capacity. We note

that, in a similar procedural setting in a factually-analogous proceeding involving a complaint to declare an indebtedness arising from a lawyer's misappropriation of funds nondischargeable, the Court in *In re Tooks*, 76 B.R. 162, 164 (Bankr.S.D.Cal. 1987), took a broad view of a "parties issue" for the following reasons:

> First, there is no policy whatsoever favoring the discharge of debts of a debtor. "[T]he purpose of the Bankruptcy Act is to grant a discharge of honest debts to honest debtors, ..." *Ragsdale v. Haller*, 780 F.2d 794, 797 (9th Cir. 1986). Second, to refuse plaintiff's request for determination of dischargeability would be to provide disincentives to the State Bar and others like [sic] the dishonest acts of members of State Bar's profession. Third, since it would provide the practical equivalent of discharge to dishonest debtors, it would positively undermine the policy behind the non-discharge of debts under 11 U.S.C. § 523(a)(4).

For policy reasons similar to those expressed in Tooks, we are inclined to treat Michener and the Fund as co-plaintiffs in the Proceeding, entitled to pursue the respective claims as follows.

We believe that the thrust of the Motion is to accord the Fund the right to pursue the Debtor for the $15,000 sum to which it is subrogated in the Agreement, while allowing Michener the right to pursue the Debtors for any sums not within the scope of the Agreement. That is the relief which we ultimately grant in our following order.

2. *The Debts Incurred by the Husband Through His Admittedly Fraudulent Actions Executed in the Course of an Attorney–Client Relationship with the Plaintiff Are Nondischargeable Pursuant to § 523(a)(4).*

■ Perhaps the least-disputed issue in the Proceeding is the substantive nondischargeability of the various amounts misappropriated from the Estate by the Husband. We note that Michener initially asserted three nondischargeability claims, invoking 11 U.S.C. §§ 523(a)(2), (a)(4), and (a)(6), respectively. However, Michener confined the discussion of the grounds for nondischargeability in his post-trial submission to those pursuant to § 523(a)(4). We must assume that Michener, having only argued one of the three originally-articulated legal grounds for the Debtors' nondischargeability, is now pressing only that one claim. We will therefore confine our analysis to the applicability of § 523(a)(4) as a basis for determining whether the claims against the Debtors should be declared nondischargeable.

■ Section 523(a)(4) of the Bankruptcy Code excepts from discharge any debt resulting from "fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny." In order for this court to determine that any portion of the Debtor's obligation may be deemed nondischargeable pursuant to the "fraud or defalcation" prong of 11 U.S.C. § 523(a)(4), Michener must prove that the Debtor was acting in a fiduciary capacity and committed a fraud or defalcation while in that capacity. *See In re Kaplan*, 162 B.R. 684, 704 (Bankr.E.D.Pa.1993), *aff'd sub nom. Kaplan v. First Options of Chicago, Inc.*, 189 B.R. 882 (E.D.Pa.1995), *reconsideration denied*, 198 B.R. 91 (E.D.Pa.1996). There, *id.* at 705, we thusly recited the requirement that there be a demonstration of an express trust relationship between the debtor and the creditor to succeed in such a claim:

> [t]he prerequisites for the creation of an express trust relationship under Pennsylvania law are, as we thusly held in *In re Kulzer Roofing, Inc.*, 139 B.R. 132, 139–40 (Bankr.E.D.Pa.), *aff'd*, 150 B.R. 134 (E.D.Pa.1992), quite demanding:
>
> > "The elements of an express trust, as developed by Pennsylvania case law, are (1) an express intent to create a trust: (2) an ascertainable res; (3) a sufficiently certain beneficiary; and (4) a trustee who "owns" and adminis-

ters the res for the benefit of another (the beneficiary). *See In re Penn Central Transportation Co.*, 486 F.2d 519, 524 (3d Cir.1973), *cert. denied sub nom. Baker v. Indiana H.B.R.R.*, 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886, (1974) (*"Penn Central I"*); *Sherwin [v. Oil City Nat'l Bank,]* ... 229 F.2d [835,] at 838, 839 [ (3rd Cir.1956) ]; *In re I.D. Craig Service Corp.*, 125 B.R. 453, 456 (Bankr. W.D.Pa.1991); *In re CS Associates*, 121 B.R. 942, 959 (Bankr.E.D.Pa. 1990); *In re Shervin*, 112 B.R. 724, 734 (Bankr.E.D.Pa.1990); and *Presbytery of Beaver–Butler United Presbyterian Church v. Middlesex Presbyterian Church*, 507 Pa. 255, 268–69, 489 A.2d 1317, 1324, *cert. denied*, 474 U.S. 887, 106 S.Ct. 198, 88 L.Ed.2d 167 (1985) .... [t]he absence of any of the express trust elements to be present is fatal to the contention that a trust exists, ... "

*See also, e.g., Thompson's Will*, 416 Pa. 249, 254–55, 206 A.2d 21, 25 (1965).

*See also In re Desiderio*, 213 B.R. 99, 102–05 (Bankr.E.D.Pa.1997); and *In re Spector*, 133 B.R. 733, 739 (Bankr.E.D.Pa.1991).

▮▮▮▮ We first address the question of whether a § 523(a)(4) fiduciary relationship existed between the parties. Long before this adversary proceeding, the Husband represented Michener as an attorney to a client.

The attorney-client relationship is a fiduciary relationship. [*In re* ] *Marchiando*, 13 F.3d [1111,] at 1116. [ (7th Cir. 1994) ]. Nonetheless, not all debts arising out of that relationship will be nondischargeable. Debts attributable to the professional negligence of an attorney, for example, do not fall under 523(a)(4). *See e.g., In re Hamilton*, 147 B.R. 779 (Bankr.D.Colo.1992); *In re Stokes*, 142 B.R. 908 (Bankr.N.D.Cal.1992). Nondischargeability is usually reserved for those situations where money or property has been entrusted to the attorney-debtor. *In re Young*, 91 F.3d [1367,] at

1371 (10th Cir.1996); *In re Kudla*, 105 B.R. 985, 990 (Bankr.D.Colo.1989). Consequently, a debt arising out of an attorney's mishandling of its client funds, will be nondischargeable under 523(a)(4). *See e.g., In re Sonnier*, 157 B.R. 976 (E.D.La.1993); *Kwiat v. Doucette*, 81 B.R. 184 (D.Mass.1987); *In re McDowell*, 162 B.R. 136 (Bankr. N.D.Ohio 1993); *In re Ducey*, 160 B.R. 465 (Bankr.D.N.H.1993); *Kudla*, 105 B.R. 985.

*In re Grotrian*, 217 B.R. 1017, 1020 (Bankr.N.D.Ind.1997). Here, there was clearly an attorney-client relationship between the Husband and Michener. That professional relationship was specifically undertaken with the intent that the Husband would administer a decedent's estate for Michener's benefit. There can be little question under such factual circumstances that the requisite fiduciary relationship existed between them.

Given the Husband's admission of his acts in defrauding his client, the language of § 523(a)(4) applies to render the debts nondischargeable, at least as to him. Any other finding would be contrary to the clear scope of this provision in the Bankruptcy Code.

An alternative argument, applying the embezzlement prong of § 523(a)(4), would reach the same result. *See In re Cook*, 146 B.R. 934, 944 (Bankr.E.D.Pa.1992); and *Spector, supra*, 133 B.R. at 739, 741 (noting that the embezzlement prong of § 523(a)(4) does not depend upon the existence of a fiduciary relationship, although it does require proof of embezzlement or larceny). It is clear that the Husband embezzled the Estate's funds.

Therefore, we conclude, with little apparent contest from the Debtors, that whatever funds were proven to be misappropriated from the Estate are nondischargeable obligations of at least the Husband. The principal defenses raised by the Debtors are whether, despite the obvious merit of the claims in the Proceeding

under dischargeability law, (1) the Plaintiffs have stumbled on the issue of joining the proper parties to prosecute the Proceeding; (2) the Fund's claims are barred by the Eleventh Amendment; (3) the Plaintiffs have not proven any misappropriations beyond the covered $15,000 sum paid to Michener by the Fund; and (4) any nondischargeability decision should not extend to the Wife. These issues are addressed hereafter in turn.

3. *The Agreement Must Be Interpreted as an Assignment By Michener to the Fund of Only His Claim to the $15,000 Paid to Him by the Fund.*

▮ The Debtors urge us to read the Agreement as (1) fixing the misappropriations of the Husband at $15,000; and (2), foreclosing Michener from seeking in excess of $15,000 because he assigned all of his claims to the Fund. Certain passages of the Agreement, read in isolation and apart from their logical factual context, could be so read. With respect to the amount of the loss, the Agreement states as follows:

... The amount of the loss alleged was $15,000.00.

The Board, after investigation, has found that the request is meritorious, and has approved it in the amount of $15,000.00 and has authorized payment of a contribution of $15,000.00 to the Claimant.

With respect to the assignment of Michener's claims to the Fund, it states as follows:

*In consideration thereof and of the conditions hereof, I agree with the Board that it shall be subrogated in all respects to any claim which I may have against the said attorney, or other person liable to me as a result of negligence, misconduct or statutory liability, and to any money, property, or other recovery which may come into my hands or any person through or under me. I hereby assign to the Board all claims which I have to my loss, subject to the provisions hereinafter stated. I*

hereby irrevocably appoint the Chairman of the Board, and any person or persons whom he may designate as substitutes for him, my attorney-in-fact, in my name, to pursue any claim with respect to my loss, by suit or other proceedings, and to do all things which he or his substitute may deem necessary or proper to effectuate a recovery of all or part of my loss, with full power to settle, compromise, and adjust any such claim, and receipt for a release for any recovery so effected. I agree if any such recovery or property comes into my hands or the hands of any person claiming through or under me with respect to my loss, I will promptly pay or deliver it to the Board.

...

BY SIGNING THIS AGREEMENT, CLAIMANT IS TURNING OVER TO THE PENNSYLVANIA LAWYERS FUND FOR CLIENT SECURITY BOARD WHATEVER RIGHTS AND CLAIMS MAY EXIST AGAINST THE ATTORNEY OR AGAINST ANY OTHER PARTY, SO THAT THE BOARD MAY PROCEED TO OBTAIN WHATEVER AMOUNTS MAY BE COLLECTIBLE FOR THE PURPOSE OF REIMBURSEMENT OF THE FUND FOR AMOUNTS PAID TO THE CLAIMANT BY THE FUND.... (emphasis added).

In his testimony, Michener made it clear that he interpreted the Agreement as assigning to the Fund his rights to recover only the $15,000 of his loss paid to him by the Fund:

Q. [by counsel for the Debtors]: The essence of that first sentence [underlined above] is, whatever claim you have against Mr. Brady, you gave it to the Pennsylvania Lawyers Fund, isn't that correct?

A. Not whatever claim I had. I don't understand that. All I understood was I could only get $15,000.

...

THE COURT: Well, could I just ask you this. You've said that you thought maybe it was more than 15 that Mr. Brady might have taken.

THE WITNESS: Yeah.

THE COURT: Did you mean to give up any rights to anything more than $15,000?

THE WITNESS: No.

. . .

Q. [by counsel for the Debtor] Please read the second sentence [underlined above] . . .

. . .

A. It was explained to me that [the meaning of that sentence was that] if anything was recovered the first $15,000 would go to this security fund. Is that what you're asking me?

Q. Yes. Now, I'm asking you whether you assigned all of your claims to the board? And this document says that you did, doesn't it?

(Pause in proceedings)

A. I understood if anything else was recovered, that they would get $15,000 that they paid me, that was it . . .

Transcript of Proceedings, April 27, 1999, at 45–46.

■■■■ An assignment is an absolute and complete transfer of property or a claim to another party. *See, e.g., In re Lease–A–Fleet, Inc.,* 141 B.R. 853, 861–62 (Bankr.E.D.Pa.1992).

> Thus, the "true test" of an assignment is "whether the debtor would be justified in paying the debt to the person claiming as assignee." *Giles v. Sun Bank, N.A.,* 450 So.2d 258, 260 (Fla.App.1984), citing *McClure v. Century Estates,* 96 Fla. 568, 120 So. 4, 10 (1928). *See also Brager v. Blum,* 49 B.R. 626, 629 (E.D.Pa.1985); *In re Robert T. Noel Coal, Inc.,* 82 B.R. 778, 780 (Bankr. W.D.Pa.1988); *In re Ashford,* 73 B.R. 37, 39 (Bankr.N.D.Tex.1987); *In re Flanders,* 45 B.R. 222, 224 (Bankr. M.D.Ga.1984); and *DeCespedes v. Prudence Mut. Cas. Co.,* 193 So.2d 224, 227 (Fla.App.1966), *aff'd,* 202 So.2d 561 (Fla. 1967). *Cf. In re Carter,* 126 B.R. 811, 813 (Bankr.M.D.Fla.1991) (assignment of rents transfers absolute ownership of rents to secured party); and *In re 163rd St. Mini Storage, Inc.,* 113 B.R. 87, 89–90 (Bankr.S.D.Fla.1990) (same).

*Id.* at 862.

■■■■ Subrogation is a doctrine which is equitable in nature. *See, e.g., In re Stratford Lamps, Inc.,* 120 B.R. 31, 34 (Bankr.W.D.Pa.1990). Thus,

> [s]ubrogation will not be applied where it would be inequitable to do so, where it would work injustice to others having equal equities, or where it would operate to defeat the lawful rights of another. [*In Re Co–Build Companies, Inc.,* 21 B.R. 635, 636 (Bankr.E.D.Pa.1982)]. In order for subrogation to apply, the equities of the party seeking to be subrogated must be superior to those of other claimants. *See Mellon Bank, N.A. v. Barclays American/Business Credit, Inc.,* 527 F.Supp. 251, 255 (W.D.Pa. 1981).

*Id.*

The Fund, as well as Michener, was made a party to the Proceeding. The Fund did not in any way contest or dispute Michener's interpretation of the Agreement, as articulated in the foregoing passage from the Transcript at pages 661–62 *supra.*

We conclude, similar to the court in *Tooks, supra,* 76 B.R. at 164, quoted at page 659, that it would be most inequitable to read the Agreement as the Debtors urge, and that to do so would be in direct conflict with the public policy behind the purposes of a state bar "victims fund." As we suggested in *Brady I,* at *2–*3, the Fund engaged in no proceedings which legally determined that the Husband's misappropriation was limited to $15,000. It would be most unfair to read the Agreement as binding on Michener as to the amount of the Husband's total misappro-

priations. It would similarly be both inequitable and illogical to read the Agreement as an assignment by Michener of all of his claims to the Fund in consideration for the $15,000 payment. Rather, it is both fair and logical to read the Agreement as an assignment and a subrogation to the Fund of Michener's rights against the Husband as to only the $15,000 misappropriation for which the Fund reimbursed Michener.

Such a conclusion is consistent with the "true test" of an assignment. We do not believe that, although the Husband would be justified in paying the first $15,000 in restitution for his misappropriations to the Fund in lieu of Michener, amounts in excess of $15,000 otherwise due to Michener could be paid by the Husband to the Fund on account of the assignment included in the Agreement, nor is there any reason to expect that the Fund would accept same. As to subrogation, it is equitable to grant the Fund such rights only as to the $15,000 amount for which it reimbursed Michener. This conclusion is consistent with *Tooks, supra,* and with our conclusions regarding the relief to which the respective parties are entitled, which we reached in deciding the Motion. *See* pages 657–59 *supra.*

The Debtors also suggest that the Eleventh Amendment to the federal Constitution somehow bars the Fund from participation in the Proceeding because there is no "documentation" that the Fund, allegedly a state agency, has waived its sovereign immunity. This argument presupposes that the Fund *is* a state entity and that counsel for the Plaintiffs has no authority to act for the Fund, assumptions which we refuse to make in the complete absence of any evidence on these points in this record. Clearly, the protections of the Eleventh Amendment are subject to waiver. *See In re Sacred Heart Hospital of Norristown,* 133 F.3d 237, 242 (3d Cir. 1998). More fundamentally, however, the Amendment only protects states from suits "commenced or prosecuted against" them. The Debtors have cited no authority for the use of the Amendment to preclude

states from exercising their rights to prosecute claims against other parties in federal court when they choose to do so. We therefore conclude, without hesitancy, that we may include the Fund as a plaintiff entitled to a judgment in the Proceeding in our order.

4. *Michener Has Valid Nondischargeable Claims for Misappropriations Against the Husband Over and Above the $15,000 Reimbursed to Him by the Fund.*

We preface our discussion on the validity of Michener's claims other than the $15,000 admitted misappropriation by the Husband in the purchase of the Home with two points. Firstly, as per our discussion under the immediately preceding headnote, Michener and not the Fund has the right to prosecute same. Secondly, we note our reluctance to liquidate claims in a nondischargeability proceeding, preferring instead, unless it is necessary to do otherwise, to confine our decisions to declarations of dischargeability and to allow courts of general jurisdiction to undertake the liquidation of such claims. *See In re Clayton,* 195 B.R. 342, 345–46 (Bankr. E.D.Pa.1996); *In re Shapiro,* 188 B.R. 140, 149 (Bankr.E.D.Pa.1995) (Fox, J.); and *In re Stelweck,* 86 B.R. 833, 844–45 (Bankr. E.D.Pa.1988), *aff'd sub nom. United States v. Stelweck,* 108 B.R. 488 (E.D.Pa. 1989).

One defense asserted by the Debtors to the claim regarding the $6,000 check of March 10, 1989, is that that check represented repayment of a personal loan from the Husband to Michener to purchase baseball cards. We reject this defense for several reasons. Firstly, we found Michener's firm denials of his making any personal loans from the Husband far more convincing than the vague, undocumented assertions of the Husband that he did so. Secondly, the Husband described the financial problems which resulted in his more serious misappropriations as beginning in 1989. It is hard to believe that

he would have had $6,000 to loan to Michener to buy baseball cards in or about 1989. Finally, the method utilized by Michener to obtain funds to purchase baseball cards on or about the same date as the $6,000 check was written was to obtain a partial advance distributions from the Estate for this purpose. No explanation was given as to why this resource could not have been tapped for another $6,000, in addition to the $37,000 already obtained by Michener through this method, if he needed that additional sum. We therefore reject the Debtors' "loan defense."

The other defense is that, even if the $6,000 and $465.32 sums referenced by Michener were misappropriated, the Husband was entitled to this amount and perhaps more as compensation for his rightful services on behalf of the Estate. This argument forms the substance of the Debtors' Counterclaim.

 This defense and Counterclaim fail for at least two clear reasons. The first is that the counsel for a decedent's estate in Pennsylvania may receive compensation only as approved by the orphans' court division of the common pleas court of the County in which the estate is being administered. *See* 20 Pa.C.S. § 711(1); *Estate of McClatchy*, 492 Pa. 352, 357–58, 424 A.2d 1227, 1230 (1981); *In re Estate of Rees*, 425 Pa.Super. 490, 497, 625 A.2d 1203, 1206 (1993); and 33 STANDARD PA.PRAC. 424–25 (1998).

 We believe that it is most unlikely that any counsel fees were or ever will be awarded to the Husband for his services on behalf of the Estate by the appropriate state court. That is because of the second reason, which is thusly succinctly stated by the Pennsylvania Supreme Court in *In re Martin*, 237 Pa. 159, 161, 85 A. 88, 89 (1912):

> Anything which savors of lack of good faith upon the part of an attorney, such as the receipt of money without giving notice to the client within a reasonable time, or the refusal or neglect to pay

over promptly upon demand, calls for forfeiture of all claim to compensation. *Balsbaugh v. Frazer*, 19 Pa. 95.

*See also Osterling v. Rose*, 286 Pa. 263, 267–68, 133 A. 374, 375 (1926); *Large v. Coyle*, 9 Sadler (Pa.) 206, 207–08, 12 A. 343, 344 (1888); and 1 STANDARD PA.PRAC., *supra*, at 663–64. There is little doubt that misappropriation of at least $15,000 from a decedent's estate "savors of lack of good faith" in the highest degree. Therefore, the Husband must forfeit all claims to any fees for services in connection with the Estate under the principles set forth in the foregoing cases.

We note that other checks admitted into evidence document at least $6,600 paid to the Husband by the Estate between 1986 and 1988. This sum, and perhaps others, appear recoverable by Michener as additional aspects of damages arising from the nondischargeable misappropriations effected by the Husband. *Compare Clayton, supra*, 195 B.R. at 345–46.

In light of this observation, and the potential that other misappropriations may come to light, we will refrain from liquidating the nondischargeable indebtedness of the Husband to Michener at $6,465.32 or any other sum certain in our following order. Rather, we will simply declare that any misappropriations of the Husband from the Estate which are ultimately proven by Michener, over and above the $15,000 payable to the Fund, are nondischargeable, at least as to the Husband.

5. *The Debtors Have Failed to Overcome the Presumption that the Husband Had the Power to Act for the Wife in the Purchase of the Entireties Home, Rendering the $15,000 Claim Arising from the Purchase of the Home Nondischargeable as to the Wife; Alternatively, a Constructive Trust Theory Supports the Same Result.*

 The final issue which must be resolved is whether the fraudulent conduct and embezzlement admitted by the Hus-

band in the purchase of the Home may be imputed to the Wife, so as to render this claim nondischargeable as to her. Rendering this claim nondischargeable as to the Wife would recognize the unjust enrichment which she would otherwise attain in the continued enjoyment of the funds misappropriated by the Husband and now entwined in the equity of the Debtors' entireties Home.

We initially considered this question when we entertained the Debtors' Motion to Dismiss the Proceeding in *Brady I, supra*, at \*3. At that time, we noted that most courts are reluctant to impose liability on spouses of debtors denied a discharge or dischargeability solely on the basis of the "innocent" spouse's having obtained a benefit from the "guilty" spouse's fraudulent activities. *See In re Cox*, 41 F.3d 1294, 1297–99 (9th Cir.1994); *In re MacPherson*, 129 B.R. 259, 261–62 (M.D.Fla.1991); *In re Reitz*, 69 B.R. 192, 195–96 (N.D.Ill.1986); *In re Straughter*, 219 B.R. 672, 675 (Bankr.E.D.Pa.1998) (Fitzgerald, J.); *In re Maltais*, 202 B.R. 807, 811–12 (Bankr.D.Mass.1996); *In re Crider*, 171 B.R. 909, 912 (Bankr.N.D.Ga. 1994); *In re Johnson*, 98 B.R. 359, 366–67 (Bankr.N.D.Ill.1988); *In re Ward*, 92 B.R. 644, 647 (Bankr.W.D.Pa.1988); *In re Martz*, 88 B.R. 663, 676 (Bankr.E.D.Pa. 1988); and *In re Daleske*, 49 B.R. 49 (Bankr.W.D.Mo.1985). However, we acknowledged some authority to the contrary, specifically in *In re O'Donnell*, Bankr. No. 96–10083SR, Adv. No. 96–799, slip op. at 8–12 (Bankr.E.D.Pa. Oct. 7, 1998) (Raslavich, J.); *In re Towe*, 147 B.R. 545, 551 (Bankr.D.Mont.1992) (ruling for "innocent" spouse, but suggesting different result if couple were "actual business partners"); *In re Luce*, 109 B.R. 202, 206 (Bankr.N.D.Tex.1989), *aff'd*, 960 F.2d 1277 (5th Cir.1992); and *In re Paolino*, 75 B.R. 641, 645–50 (Bankr.E.D.Pa.1987) (Fox, J.).

We suggested to the parties that they evaluate particularly the second line of cases which holds that the "innocent" spouse's involvement or use of the fruits of the "guilty" spouse's wrongful activities may indeed render a declaration of nondischargeability against the putative "innocent" spouse appropriate. The reasoning underlying such decisions arises from the application of traditional principles of agency law to the marital relationship. *See Paolino, supra*, 75 B.R. at 644–45. Of particular value to the Plaintiff here is a further provision of Pennsylvania law which does not recognize any automatic general agency arising from the marital relationship but does create

> "a presumption with respect to entireties property that either spouse has the power to act for both without any specific authority, so long as the acting spouse's action benefits both. This presumption, with respect to entireties property, does not require knowledge on the part of the other spouse. The presumption can be rebutted by evidence that the acting spouse was not authorized to act for both. *See J.R. Christ Construction Co. v. Olevsky*, 426 Pa. 343, 232 A.2d 196 (1967); *Bradney v. Sakelson*, 325 Pa.Super. 519, 473 A.2d 189 (1984)."

*Paolino, supra*, 75 B.R. at 644–45, quoting *In re Paolino*, 72 B.R. 323, 328 (Bankr. E.D.Pa.), *aff'd*, 75 B.R. 553 (E.D.Pa.1987). *But see Lapio v. Robbins*, 1999 PA Super 106, 729 A.2d 1229 (1999) (refusing to hold a wife personally liable on a business loan entered into by the husband, and guaranteed by entireties property).

In the instant case, the testimony and post-trial submissions of the Debtors focused exclusively on whether the Wife knew of or participated in the Husband's wrongdoing. There is no real dispute that the Wife did not have any knowledge, at least at the time that they took place, nor did she participate in, any of the Husband's wrongdoings. Also, we note that the only transaction at issue with which the Wife has any connection is the purchase of the Home. Therefore, the Wife has no obligation, dischargeable or other-

wise, arising from any of the Husband's other misappropriations.

What is significant to our analysis regarding the Home purchase transaction is that the Debtors chose not to address the nature of the Wife's participation or lack thereof in the negotiations, agreement, and settlement on the Home. The critical aspect of the applicable law in Pennsylvania is a presumption which exists until rebutted by a preponderance of the evidence that the Husband acted for the Wife with respect to all aspects of the purchase of this entireties property. Thus, the Debtors did not offer any rebuttal evidence which tended to undermine the presumption of agency of their relationship relative to the purchase of the entireties property which they acquired with, in part, the misappropriated $15,000. Hence, it is of little consequence that the Wife knew nothing of the misbegotten source of the funds for the Home purchase, because the law presumes agency unless rebutted by a preponderance of evidence. *See J.R. Christ Construction Co., supra* at 349–50, 232 A.2d 196. ("This presumption [of agency between spouses], as stated, does not require knowledge on the part of the other spouse in question ... [and] stands unless and until the other spouse establishes by a preponderance of the evidence that ... the spouse was in fact not authorized to act for and to bind her in a contract ... the benefits of which ran in favor of both tenants by entireties."). We therefore conclude that the record fails to include evidence which could lead to a conclusion other than that the Wife shares the obligation of the Husband to the Fund for the $15,000 misappropriation in the Home purchase transaction, and that this obligation is equally nondischargeable as to her.

In their post-trial briefing the Plaintiffs present an alternative basis on which the Wife should be deemed liable with the Husband as to the $15,000 misappropriation. That is the imposition of a constructive trust on the $15,000 portion of the Home purchased with the misappropriated funds. In *In re Sacred Heart Hospital of Norristown,* 175 B.R. 543, 554–55 (Bankr.E.D.Pa.1994), we thusly described the nature of constructive trusts under applicable Pennsylvania law:

> A constructive trust is not a trust at all, but, rather, under Pennsylvania law, an equitable remedy designed to prevent unjust enrichment. *See e.g., Yohe v. Yohe,* 466 Pa. 405, 411, 353 A.2d 417, 420 (1976); *Gray [v. Leibert,], supra,* 357 Pa. [130,] at 135, 53 A.2d [132,] at 135 [ (1947) ]; and *Gee v. Eberle,* 279 Pa.Super. 101, 112, 420 A.2d 1050, 1056 (1980). A constructive trust does not depend upon the intentions of the parties. *Gray, supra,* 357 Pa. at 135, 53 A.2d at 132. Rather, a constructive trust arises when a party holds property subject to an equitable duty to convey it to another. *Yohe, supra,* 466 Pa. at 411, 353 A.2d at 421; *Truver [v. Kennedy], supra,* 425 Pa. [294,] at 305, 229 A.2d [468,] at 474 [ (1967) ]; and *Gray, supra,* 357 Pa. at 135, 53 A.2d at 135. This equitable duty arises only in the presence of fraud, duress, undue influence, mistake, or abuse of a confidential relationship. *Yohe, supra,* 466 Pa. at 411, 353 A.2d at 421.

> The types of confidential relationships' which are typically the subject of constructive trusts include the relationship between a fiduciary and those who place their trust in him.... In Pennsylvania, the question of whether a particular relationship is confidential is one of "fact and arises when one party places confidence in another with a resulting superiority of influence on the other side." *Yohe, supra,* 466 Pa. at 412, 353 A.2d at 421; and *Truver, supra,* 425 Pa. at 305–06 & n. 4, 229 A.2d at 474 & n. 4.

Here, we find the presence of fraud and abuse of a confidential relationship which would justify the imposition of a constructive trust in the amount of the $15,000 misappropriation against the Home. While this alternative basis does not have the

same personal thrust as a determination that the indebtedness for the $15,000 is nondischargeable, the result in the same. An obligation to pay this sum would be imposed against the entireties Home.

For that matter, since the Husband contends that he will be obliged to pay restitution as assessed by the state court to regain his right to practice law in any event, the declaration of nondischargeability is of little practical consequence to the Debtors. Our following order will therefore be unlikely to add any real financial burden to the Debtors in any event.

## D. Conclusion

For all of the foregoing reasons order will be entered.

### ORDER

AND NOW, this 14th day of June, 1999, after a trial of the above-captioned proceeding on April 27, 1999, in the course of which we indicated that we would also decide the Plaintiff's motion to file an Amended Complaint ("the Motion") after the trial, and upon consideration of the parties' respective post-trial submissions, it is hereby ORDERED AND DECREED as follows:

1. The Motion is GRANTED. Both WILLIAM M. MICHENER, JR. ("Michener"), individually and as Executor of the Estate ("the Estate") of MARGARET E. QUINN, Deceased; and the PENN-SYLVANIA LAWYERS FUND FOR CLIENT SECURITY ("the Fund") are deemed Plaintiffs in the Proceeding.

2. Judgment is entered in part in favor of the Fund against both Defendants. The $15,000 claim of the Fund is therefore DECLARED nondischargeable as to both Defendants.

3. Judgment is also entered in part in favor of Michener against Defendant GEORGE CHARLES BRADY, III ("the Husband") only. Any and all claims which Michener is able to establish in any subsequent proceedings based upon any misap-

propriation of funds from the Estate against the Husband are DECLARED nondischargeable.

4. Judgment is entered in favor of the Plaintiffs and against the Defendants on the Defendants' Counterclaims. The said Counterclaims are accordingly DIS-MISSED.